163 N.J. Super. 344 (1978)
394 A.2d 914
EDWARD F. CLARK, JR., COUNTY EXECUTIVE OF THE COUNTY OF HUDSON, WILLIAM F. PEARL, JR., COMPTROLLER OF THE COUNTY OF HUDSON, THE BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF HUDSON AND THE COUNTY OF HUDSON, PLAINTIFFS, AND COUNTY OF UNION, COUNTY OF BERGEN, COUNTY OF BURLINGTON, COUNTY OF CAMDEN, COUNTY OF CUMBERLAND, COUNTY OF ESSEX, COUNTY OF HUNTERDON, COUNTY OF MERCER, COUNTY OF MONMOUTH, COUNTY OF MORRIS, COUNTY OF OCEAN, COUNTY OF PASSAIC, COUNTY OF SALEM, COUNTY OF SOMERSET, AND COUNTY OF SUSSEX, PLAINTIFFS-INTERVENORS,
v.
JOHN J. DEGNAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, JOHN F. LAEZZA, JR., DIRECTOR OF THE DIVISION OF LOCAL GOVERNMENT IN THE STATE OF NEW JERSEY, THE LOCAL GOVERNMENT BOARD IN THE DIVISION OF LOCAL GOVERNMENT IN THE STATE OF NEW JERSEY, ANN KLEIN, COMMISSIONER OF THE DEPARTMENT OF HUMAN SERVICES IN THE STATE OF NEW JERSEY, ARTHUR J. SIMPSON, ADMINISTRATIVE DIRECTOR OF THE COURTS IN THE STATE OF NEW JERSEY AND GORI CARFORA, COURT ADMINISTRATOR FOR THE COUNTY OF HUDSON, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided October 17, 1978.
*349 Mr. Charles M. Schimenti, argued the cause for plaintiffs (Mr. Harold Krieger, Hudson County Counsel, attorney; Mr. Frank T. Koserowski, Assistant County Counsel, on the brief).
Mr. William J. McCloud, County Counsel, argued the cause for plaintiff-intervenor County of Union and certain other plaintiffs-intervenors.
Mr. Glenn T. Leonard, Assistant County Counsel, argued the cause for plaintiff-intervenor County of Bergen (Mr. Vincent P. Rigolosi, County Counsel, attorney).
*350 Mr. William E. Ozzard, County Counsel, argued the cause for plaintiff-intervenor Somerset County.
Mr. Alfred J. Villoresi, Assistant County Counsel, argued the cause for plaintiff-intervenor Morris County (Mr. Armand D. Agostino, County Counsel, attorney).
Mr. Theodore W. Daunno, Assistant County Counsel, appeared for plaintiff-intervenor Essex County (Mr. Peter G. Stewart, County Counsel, attorney).
Mr. Robert Budesa, Assistant County Counsel, appeared for plaintiff-intervenor Ocean County (Mr. Franklin Berry, Jr., County Counsel, attorney).
Mr. M. Jefferson Davis, Burlington County Solicitor, for plaintiff-intervenor Burlington County.
Mr. John A. Yacovelle, County Counsel, for plaintiff-intervenor Camden County.
Mr. Ivan M. Sherman, Cumberland County Solicitor, for plaintiff-intervenor Cumberland County.
Mr. Edwin K. Large, Jr., County Counsel, for plaintiff-intervenor Hunterdon County.
Mr. Richard W. Raines, Assistant County Counsel, for plaintiff-intervenor Mercer County (Mr. Harvey L. Stern, County Counsel, attorney).
Mr. Richard O'Connor, County Counsel, for plaintiff-intervenor Monmouth County.
Mr. Martin Verp, County Counsel, for plaintiff-intervenor Passaic County.
*351 Mr. George S. Friedman, County Counsel, for plaintiff-intervenor Salem County.
Mr. Donald L. Kovach, County Counsel, for plaintiff-intervenor Sussex County.
Mr. Benjamin D. Lambert, Jr., Deputy Attorney General, argued the cause for defendants (Mr. John J. Degnan, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel; Mr. Benjamin D. Lambert, Jr. and Mr. Daniel P. Reynolds, Deputy Attorneys General, on the brief).
PETRELLA, J.S.C.
This action was instituted by filing of a verified complaint and issuance of an order to show cause on February 15, 1978 on application of Hudson County for certain declaratory and injunctive relief as a result of enactment of "An Act to place limits on expenditures by counties and municipalities and supplementing Title 40A of the New Jersey Statutes," L. 1976, c. 68, effective August 18, 1976, as amended by L. 1977, c. 10, effective February 3, 1977. N.J.S.A. 40A:4-45.1 et seq. The act is referred to hereinafter as the "Cap" statute. Various motions to intervene were filed on behalf of 15 of the remaining 20 counties in this State. On May 12, 1978 an order was entered by the Supreme Court specially assigning the case to be heard in Bergen County. By a June 6, 1978 order the motions to intervene were granted. Complaints in substantially the same form as the original complaint were filed by the plaintiffs-intervenors,[1] and answers were filed on behalf of defendants.
Plaintiffs-intervenors and defendants moved for summary judgment on the adjourned return date of the order to show cause. On that date all parties stipulated that there were no disputed facts and requested the court to decide *352 the legal issues based on the merits and the papers filed without the necessity of taking any testimony. It was stipulated that what was in dispute were certain costs mandated prior to the effective date of the Cap statute.
The central issue is thus whether the Cap statute also necessarily or by implication puts limitations on defendants and certain state mandated expenses imposed on the counties, authority for which preexisted or was enacted prior to the effective date of the Cap statute. Defendants argue that the Cap statute is illusory without concomitant limits on what the State can mandate.
Defendant Degnan is the State Attorney General and responsible for advising the various state departments and most state agencies in the Executive Branch of the State Government. Certain of the defendants are the heads of various Executive Department state agencies. For example, defendant Laezza is the Director of the Division of Local Government in the Department of Community Affairs, and defendant Klein is the Commissioner of the Department of Human Services. Defendant Simpson, the Acting Administrative Director of the Courts, and defendant Carfora, the Court Administrator for the County of Hudson, are employed by the Judicial Branch of the State Government.

I
It may be asked whether this case should properly be cognizable before the Appellate Division because certain challenges arising under the Cap statute relate to so-called formula costs for patient care and to welfare programs administered under direction of the Commissioner of the Department of Human Services and other state officials. Plaintiffs and plaintiffs-intervenors have argued, and in effect asserted, that defendants are required by N.J.S.A. 40A:4-45.1 et seq. to limit their "demands" upon the complaining counties for appropriations to support certain governmental purposes and that no exception in the Cap statute applies.
This lawsuit actually challenges application of the Cap statute in large part as it relates to various formulas *353 set forth in state legislation, or to mandatory provisions in statutes enacted prior to the Cap statute and which are still in effect. Under R. 2:2-3(a)(2) if this suit were primarily "to review final decisions or actions of any state administrative agency or officer * * * or to review the validity of any rule promulgated by such agency or officer * * *," the appeal or challenge would be as of right to the Appellate Division of the Superior Court.[2] However, the ruling requested before this court is essentially declaratory and for injunctive relief, involves interpretation of a statute, and is not, except insofar as it may have resulted from a decision or action by a state agency or officer under certain statutes, an appeal or review of a final decision or action of a state officer or agency. The court will, therefore, proceed to consider the matter.
Hudson County initially alleged that as a result of these increased demands under preexisting statutes, the budget for 1978 for Hudson County would exceed the limitations imposed by N.J.S.A. 40A:4-45.1 et seq. by approximately $1,559,027. Thus, its complaint originally requested that the court direct defendants to reduce their 1978 "budget demands" to an amount within the 5% limitation as to such items, and that the court enjoin defendants from submitting "budget demands or mandating annual expenditures" which exceed the asserted statutory limitations.
It is stipulated and conceded that on February 23, 1978 Hudson County approved its 1978 budget which provided that $57,292,782 was to be raised by the county-purpose tax in order to meet the total appropriation of $126,866,468. It is also undisputed that after appropriate adjustments provided by the Cap statute the increase in the amount raised by the county-purpose tax for Hudson County was $1,725,769, approximately 3.5% more than the amount raised by the tax in 1977 to which the 5% limitation is applied. This increase *354 is obviously less than allowable under the statutory limitation. Hudson County thus could have appropriated approximately an additional $1,500,000 without violating the Cap statute. The complaint of Hudson County was, therefore, amended to reflect that it was not required to and did not violate the provisions of the Cap statute for its 1978 budget. Likewise, all intervening plaintiffs adopted budgets within the limitations of the Cap statute. Indeed, the statement accompanying the budget adopted by Union County appears to reflect an air of pride that it was formulated within the framework of that statute.
It is further admitted that on April 14, 1978 defendant Director of the Division of Local Government Services, pursuant to N.J.S.A. 40A:4-79, approved the Hudson County budget and certified it was in compliance with the requirements of law. On various other dates the budgets of all plaintiffs-intervenors were likewise adopted and approved.
A preliminary question, therefore, is whether the case is now moot. All parties urge the court to enter a declaratory judgment notwithstanding adoption and approval of the 1978 county budgets because of the public importance of the issue and the necessity for a determination prior to preparing subsequent budgets, at least for the 1979 budget year and before this temporary legislation with an initial three-year lifespan, expires by its own terms. See infra at 359. It may well be that this legislation will presently be extended for an additional three-year period in view of current legislative activity.
This court is empowered by N.J.S.A. 2A:16-50 et seq. to enter a declaratory judgment. However, it is clear that the court will not render merely advisory opinions. See N.J. Mtg. Finance Agcy., v. McCrane, 56 N.J. 414 (1970); Wagner v. Ligham, 37 N.J. Super. 430, 431 (App. Div. 1955), and Friedland v. State, 149 N.J. Super. 483, 495 (Law Div. 1977). The jurisdiction of this court may be invoked only if there is a bona fide controversy between the parties. See N.J. Mtg. Finance Agcy. v. McCrane, supra. *355 56 N.J. at 418-419; N.J. Turnpike Auth. v. Parsons, 3 N.J. 235, 240 (1949).
Here there is a sufficient adversary dispute between the parties and the question is of sufficient public importance that the court will undertake to resolve the issues before it, notwithstanding compliance with the Cap statute as to the 1978 county budgets. See Patrolman's Benevolent Ass'n v. Montclair, 70 N.J. 130, 135 (1976); Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n, 64 N.J. 17, 22 (1973), and Busik v. Levine, 63 N.J. 351, 364 (1973), app. dism. 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973). Cf. Galloway Tp. Bd. of Ed. v. Galloway Tp. Ed. Ass'n, 78 N.J. 25, 38-47 (1978); Galloway Tp. Bd. of Ed. v. Galloway Tp. Ass'n of Educational Secretaries, 78 N.J. 1, 16-23 (1978).
The complaints in this case have been directed to the requirements for the 1978 budget. In view of the clear thrust of the arguments and the stipulations at the argument on the order to show cause and the summary judgment motions and cross-motions, the court considers such requests as motions to amend the pleadings and allows assertion of claims for declaratory relief with respect to the 1979 budget year.

II
The complaining counties seek a judgment declaring that defendants are bound by and must take into account limitations set forth in N.J.S.A. 40A:4-45.2, and subject to the enumerated exceptions in N.J.S.A. 40A:4-45.4, with respect to the requirements of inclusion of certain items in the county budgets. Their complaints allege generally that defendants have failed to abide by the 5% limitation which the statute establishes upon increases in the county tax levy as the result of certain state-mandated expenditures in the county budget. These include primarily the county contributions to the maintenance of certain county patients at state institutions for the mentally ill and mentally retarded, *356 welfare costs and amounts appropriated to provide judicial services in the respective counties. It is argued that by the State exceeding 5% for those items it thereby seriously affects or impinges on other line item expenditures dependent upon the county purpose tax.
N.J.S.A. 40A:4-45.2 provides:
Beginning with the tax year 1977 municipalities, other than those having a municipal purposes tax levy of $0.10 or less per $100.00 and counties shall be prohibited from increasing their final appropriations by more than 5% over the previous year except within the provisions set forth hereunder.
Certain exceptions to the limitations contained in the foregoing section are set forth in N.J.S.A. 40A:4-45.4, as amended, which reads as of the date of this decision:
In the preparation of its budget, a county may not increase the county tax levy to be apportioned among its constituent municipalities in excess of 5% of the previous year's county tax levy, subject to the following exceptions:
a. The amount of revenue generated by the increase in valuations within the county based solely on applying the preceding year's county tax rate to the apportionment valuation of new construction or improvements within the county and such increase shall be levied in direct proportion to said valuation;
b. Capital expenditures funded by any source other than the county tax levy;
c. An increase based upon a resolution making an emergency appropriation according to the definition provided in N.J.S. 40A:4-46 approved by at least two-thirds of the board of chosen freeholders of the county and, except as to an emergency appropriation for a purpose referred to in d. or f. below, where pertinent, approved by the county executive;
d. All debt service;
e. Expenditures mandated after the effective date of this act pursuant to State or Federal law;
f. Amounts required to be paid pursuant to any contract with respect to use, services or provision of any project, facility or public improvement for water, sewer, solid waste, parking, senior citizen housing or any similar purpose, or payments on account of debt service therefor, between a county, and any other county, municipality, school or other district, agency, authority, commission, instrumentality, public corporation, body corporate and politic or political subdivision *357 of this State. With respect to the amounts required to be paid for senior citizen housing in the above cited political subdivisions or bodies, the exceptions shall be subject to the review and approval of the Local Finance Board.
Defendants deny that the statute was or is in any way intended to limit the amount by which the challenged budgetary items mandated by the State in a county budget, and not subject to an exception from the 5% limitation, may be increased.
Essentially, all parties claim that mandatory programs or spending requirements which have their genesis in law prior to the effective date of the act are included under the Cap limitation provisions. The complaining counties then take the position that individual budgetary line items under such programs should not be required by state agencies to be increased by more than 5% in the absence of a subsequent mandatory enactment or amendment to the Cap statute.
Plaintiffs assert they are prevented or at least inhibited from using such funds as they might in their discretion appropriate for such necessary services as road maintenance, improvement of the county jail and penitentiary and other services considered necessary or desirable by the respective boards of chosen freeholders.[3] In this respect the complaining counties allege in general terms a deprivation of due process of law under the State and Federal Constitutions.
With the exception of Somerset County, plaintiffs and plaintiffs-intervenors initially maintained that each line item in their respective budgets for items allegedly mandated *358 by or through the various defendants, and not included within an exception in N.J.S.A. 40A:4-45.4, was by virtue of the Cap statute limited to 5% above that appropriated for such items in the previous year. Defendants dispute this and assert that the limit applies to the aggregate of the items subject to the Cap statute in future budgets. However, post-hearing briefs of certain intervening counties appear to retreat from the position originally taken by plaintiffs.
The counties' argument that the mandating of expenses to the counties in excess of 5% as to items subject to the Cap statute significantly undermines the constitutional policy of encouraging the liberal construction of laws relating to local governments in their favor (N.J. Const. (1947), Art. IV, § VII, par. 11), must be weighed against the policy of the Cap statute. The argument is that if the State mandates limitations on the county tax levy, and then mandates the distribution of revenues, what effect or purpose does local government serve? However, that same constitutional provision limits the power of counties where inconsistent with or prohibited by Constitution or law.
In Bonnet v. State, 141 N.J. Super. 177, 272-273 (Law Div. 1976), aff'd 155 N.J. Super. 520 (App. Div. 1978), it was noted that this issue was confronted at the New Jersey Constitutional Convention. A proposal to limit state power to mandate expenditures was not approved. In Bonnet, however, the Faulkner Act was recognized as a commitment to local government:
So long as the State has decided in the exercise of its constitutional power that there shall be local units of government, then * * * such units of government must have enough taxing power to carry on their essential functions or they cannot operate. The basic thought is that the courts cannot compel local officials * * * to do the impossible. [Id. at 273-274.]
The express legislative policy is in N.J.S.A. 40A:4-45.1:
It is hereby declared to be the policy of the Legislature that the spiraling cost of local government must be controlled to protect *359 the homeowners of the State and enable them to maintain their homesteads.
At the same time the Legislature recognizes that local government cannot be constrained to the point that it is impossible to provide necessary services to its residents.
In recognition that the two concepts may be at cross purposes, the Legislature recommends that the program proposed hereunder be instituted on an experimental basis with a review at the end of the period to adjust the program based upon experience.
The court holds that the Cap statute does not impose a line item by line item limitation but rather one on the overall budget to the extent the budget is subject to the statute. N.J.S.A. 40A:4-45.4 permits increases in any particular line item of a county budget by more than 5% as long as the county tax levy is limited to 5% in excess of the levy for the preceding tax year, plus amounts authorized by the itemized exceptions. The Cap statute expressly states that its purpose is to place limits on local government spending.[4] It imposes no limitation upon state spending.[5]
The Cap program as to counties and municipalities is thus an "experimental" one, scheduled to expire by its own terms on December 31, 1979, at the end of a three-year term. See L. 1976, c. 68, § 7. Bills to extend this statute for an additional three years are presently pending in the Legislature. For example, one of these, S-1245, has presently received legislative approval. However, recognizing that *360 much of the local spending is mandated by what the State Legislature does, the argument is that actions of the Legislature can undermine the salutary effect and intent of the Cap statute in attempting to hold down increases in local government costs. In addition, it was pointed out in post-hearing briefs that a county might, for example, be forced to issue bonds to maintain road systems, and the higher costs of borrowing, exempt from the Cap statute (N.J.S.A. 40A:4-45.4d), defeats the intent and purpose of the Cap statute.

III
Although the amounts and categories vary somewhat from county to county, Hudson County illustrates the problem confronting the counties, and for simplicity examples referable to it will be used. Nevertheless, the conclusions of law apply to all parties. Hudson County asserts that the cost for the care of the mentally ill, welfare costs and judicial costs reflect increases of more than 5% over 1977. However, its actual judiciary appropriation for 1978 decreased $52,147 from the amount appropriated in 1977. Even so, some of the amount attributable to "judicial costs" does not even appear properly includable because certain judicial salary increases payable by a county were enacted subsequent to the Cap statute. See L. 1977, c. 317 (effective January 1, 1978), N.J.S.A. 2A:1A-6. The Annual Appropriation Act, e.g., L. 1978, c. 60, provides sums for 40% reimbursement to the counties for the salaries of judges of the County Courts. See N.J.S.A. 2A:3-19. This indicates a legislative intent that the counties continue to pay their share of such judicial salaries (at least until the voters approve a referendum of the type presently on the ballot this coming November which would transfer salary responsibility for County Court judges to the State. See ACR-38). Furthermore, plaintiffs err in alleging that defendant Acting Administrative Director of the Courts or *361 any trial court administrator mandates any expenditure. Expenditures made are, in general, pursuant either to specific statutory mandate or to legislation framed in permissive language.
The Administrative Director of the Courts and trial court administrators have no power or authority to mandate expenditures, but only act as advisors and aids to the court. Only the court can enter orders. Administrative personnel only act when and as authorized by the court.
Hudson County alleges in its verified complaint an increase in its state-mandated appropriations from $6,950,600 in 1977 to $8,350,600 (approximately 20%) in 1978 for care of the mentally ill and mentally retarded for Hudson County patients at state institutions allegedly required by "demands" placed upon them by defendant Commissioner. It alleges that this causes the "County to eliminate other state mandated essential services." Presumably it refers to eliminating only those "essential" services mandated before the effective date of the Cap statute because subsequent enactments are not subject thereto. However, these increases were not "mandated" by the Commissioner, but rather by the State Legislature in increasing the 1978 appropriation for specific counties and by the requirements of statute. The amount appropriated is a function of the number of patients and residents from Hudson County being maintained in the state institutions pursuant to a formula set forth in N.J.S.A. 30:4-78 which was adopted prior to the effective date of the Cap statute.
The uncontroverted affidavits before the court show that the costs for maintenance of mentally ill patients is allocated between the State and the county (and in some instances the family). Under N.J.S.A. 30:4-78 a county is required to pay one-half the cost of maintenance of each individual from its area. The daily per capita cost is derived by adding noncapital legislative appropriations and fringe benefits of employees and then dividing that sum to arrive at a daily *362 per capita cost per institution. The county is then billed monthly for its one-half share of each patient resident.
From 1977 to 1978 the Legislature increased its appropriation in an amount which required the County of Hudson to pay approximately $1,400,000 more than the 1977 appropriation for maintenance of county patients in state institutions. See N.J.S.A. 30:4-78. Hudson County objected to this approximate 20% increase over the 1977 appropriation. It challenged the increase as not being due to the increase in the number of county residents, which it alleges has remained substantially the same, although it has not factually established any specific number.
Major expense items, and significant items as to the Hudson County budget, are the welfare costs which consist primarily of assistance to families with dependent children (AFDC) (see N.J.S.A. 44:10-1), supplemental security income (SSI) (see N.J.S.A. 44:7-85), and other welfare expenses and costs. An express purpose of the welfare statutory scheme (N.J.S.A. 44:10-3) is to secure such participation as will obtain the "maximum Federal financial participation that is available with respect to a program of aid to families with dependent children and otherwise to accomplish the purposes of this act * * *."
The AFDC program is funded primarily under federal law. The Federal Government pays 50% of the cost of the program, State Government contributes 37 1/2%, and the county contributes 12 1/2%. The county's actual dollar share is determined by the number of eligible persons and the state appropriation. Based on this percentage formula, established prior to the effective date of the Cap statute, the 1977 actual contributions with respect to Hudson County, as set forth in an uncontroverted affidavit from the Department of Human Services, were as follows:

 Federal $27,248,825 50%
 State 20,530,284 37 1/2%
 Hudson 6,843,428 12 1/2%
 ___________
 $54,622,538

*363 SSI is likewise funded by federal, state and county contributions. The nonfederal 50% share is divided between the State (75%) and the county (25%). As a practical matter, the Department of Human Services (DHS) recommends to the Legislature a suggested appropriation each year to meet the anticipated cost of participating in the program. The Legislature is, of course, free to adopt, modify or reject the recommendation, subject to federal law and the realities of utilizing maximum federal financial participation. In any event, after appropriation of an amount for each item by the Legislature, the Department then recommends to the respective counties appropriations for the following fiscal year which would meet the required formula. Such recommendations, based on the Appropriations Laws as enacted, were that Hudson County appropriate:

Program 1977 1978 % Increase
AFDC $6,997,000 $7,420,000 6+
SSI 811,000 646,000 (-20)

There are discrepancies in the above figures for the 1977 Hudson County contribution and the recommendations for 1977. (Hudson County contributed $153,572 less than recommended, as compared with the figures shown on the 1978 budget for Hudson County, but such variations have no bearing on this decision). Annual per capita AFDC contributions by Hudson County based on the 1977 actual contribution for a January 1977 caseload of 16,543, rose from $413.68 to $433.49 in 1978, using the 1978 recommendation and the December 1977 caseload of 17,117. The caseload increase in Hudson County of 574 would result in an increase of $237,452.32 to 248,823.26, depending on the per capita contribution used. Using the January 1977 per capita contribution as a constant would be without regard to increased costs or inflation.
The counties must also provide for the administration of various welfare programs. Payment of administration costs for these programs is also mandated by statute (see N.J. *364 S.A. 44:7-7 et seq.), and are generally borne by the county. In 1977 Hudson County expended $7,061,688 for expenses and was reimbursed $4,221,467 by the Federal Government.
All parties assume that the formulas relative to appropriations for patient treatment and welfare are subject to the limitations of the Cap statute and are not within the exception of N.J.S.A. 40A:4-45.4(e), notwithstanding the annual appropriation statute fixing the amount of the State's share, which in turn determines the requirement for the counties. The court assumes, without deciding, the correctness of this premise for purposes of this decision.
Where the parties differ, however, is as to the effect of the application of this premise between the State and the counties. The counties argue that the Cap statute therefore requires the State to be mindful of and observe the 5% limitation on the increase in each county tax levy, and not take any action which would require a county to provide for an increased appropriation for these items in excess of 5%. The Attorney General argues that the counties must first accommodate all state mandated requirements not embraced in the exception "mandated by law" after the effective date of the Cap statute, even if the entire 5% limitation would be used up so that a county could not provide for other county functions, whether mandated or discretionary under enabling legislation enacted prior to the adoption of the Cap statute. The parties appear to assume that the term "law," as used, makes the exception narrowly confined to subsequent statutory law. This will be discussed in Part IV, infra. Neither the counties nor the Attorney General argues that the state appropriation act,[6] together with still effective statutes adopted prior to the Cap statute, create either a continuing mandate or a mandated expenditure subsequent to enactment *365 of the Cap statute.[7]Cf. 2 Sutherland, Statutory Construction (4 ed. 1973), § 34.01 at 21.
The Attorney General argues that the Legislature is presumed cognizant of other legislation and that in enacting the Cap statute it was aware of the existing welfare legislation and statutory scheme relative to maintenance of patients which it had previously enacted and which it has funded since the enactment of the Cap statute. Cf. State v. Federanko, 26 N.J. 119, 129 (1958). He then argues that because the Legislature chose to neither expressly repeal nor amend the AFDC legislation in enacting the Cap statute, it should be concluded that the Legislature intended that the provisions of that legislation continue to be given full effect subsequent to the enactment of the Cap statute. Thus, certain of the defendants conclude that because the program is mandatory in all counties, this requires that all funds appropriated by the State Legislature for the AFDC program be expended in order to obtain the maximum benefit of matching federal participation.
The Executive Branch defendants further assert that any doubt as to legislative intent was resolved when the Legislature amended certain sections of the AFDC legislation by L. 1977, c. 127 (see N.J.S.A. 44:10-1 et seq.) subsequent to enactment of the Cap statute. They contend this demonstrates an intent that the program is to be fully funded, and for the counties to continue to contribute the maximum amount mandated by the statutory formula. The Attorney General argues on behalf of the Commissioner of DHS that in choosing between competing demands for state and county tax dollars, the Legislature has indicated its intent that all *366 monies it appropriates for the program be expended and that all counties in the State are obligated to participate in and to provide full funding for the program. Under this view a county must fully fund its financial share of the program even if this means utilization of all of the permissible annual increase in the county tax levy or if it requires the use of funds which it might otherwise allocate to other purposes.
In response to an argument of plaintiffs that such a result would be unfair in that the State would be imposing upon the counties the responsibility of meeting state obligations at the expense of cutting back on county services, defendants argue that such a position is based on the invalid assumption that there are two classes of programs carried out by the county, one being those of the State, the other being those of the county. The State correctly argues that as creatures of the State the counties can only act on the basis of authority granted by the State.
A county is a creature and subdivision of the State, constituted to perform certain functions of State Government. State v. Rush, 46 N.J. 399, 414 (1966). And, although counties are entities unto themselves by virtue of statute constituting them as bodies politic and corporate, N.J.S.A. 40:18-1, they are, nevertheless, subject to the will of the Legislature. Bergen Cty. v. Port of N.Y. Auth., 32 N.J. 303, 312-313 (1960); Union Cty. v. State, 149 N.J. Super. 399, 404 (Law Div. 1977).
This is so notwithstanding the provision of the New Jersey Constitution for liberal construction of the Constitution and laws concerning counties. The due process argument has no merit here when considering budget making and legislative discretion, for several reasons. It is clear that counties, like municipalities, "have no rights in their governmental capacities under the Fourteenth Amendment as against the State which created them." See Williams v. Mayor and Council of Baltimore, 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed.2d 1015 (1933); Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923), and Bonnet *367 v. State, supra, 141 N.J. Super. at 203. Even if this were not so and did not apply to the individual plaintiffs in this case, whatever their capacity, the result would not be different in this case because the State has discretion here. The United States Supreme Court stated in Trenton v. New Jersey, supra:
All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protests. In all these respects, the state is supreme; and its legislative body, conforming its action to the state Constitution may do as it will, unrestrained by any provision of the Constitution of the United States. * * * The power is in the state, and those who legislate for the state are alone responsible for any unjust or oppressive exercise of it [262 U.S. at 186-187, 43 S.Ct. at 536, 67 L.Ed. at 941.]
The Cap statute is experimental legislation on a temporary basis, and provides for legislative review of its operation. If any program is "necessary and vital," there are safety valves provided, including the use of emergency procedures under N.J.S.A. 40A:4-45.4(c). That subsection defines an emergency "according to the definition provided in N.J.S. 40A:4-46 * * *." (Emphasis supplied). Whether, as the counties asserted in oral argument, the emergency route results in a reduction in whole or in part of the amount available for inclusion in the budget the following year, or reduces the Cap in the following year for a county, as distinguished from a municipality, is not an issue here. See infra at 370, fn. 8.
In addition, no procedural due process question is projected in this case because (1) all budgets, and particularly Hudson County's, were adopted in compliance with the Cap statute; (2) the relief sought is essentially declaratory and an interpretation and application of a statute, and (3) it is not applicable to a legislative function or a quasi-legislative process of budget making. See as to the latter point, Ufheil Constr. Co. v. Oradell, 123 N.J. Super. 268, 273 (App. Div. 1973); Bayonne v. Div. of Tax Appeals, 49 N.J. Super. 230, 240 (App. Div. 1958); Yellow Cab Corp. v. *368 Passaic City Council, 124 N.J. Super. 570, 579 (Law Div. 1973); and cf. Trenton v. New Jersey, supra; Consolidation Coal Co. v. Kandle, 105 N.J. Super. 104, 113 (App. Div.), aff'd 54 N.J. 11 (1969). Compare Hyman v. Muller, 1 N.J. 124, 129 (1948), and In re Masiello, 25 N.J. 590, 600-601 (1958).
Nor is there a factual issue projected as a matter of law which would warrant a different determination in this case based on a claim of lack of substantive due process. No county has suggested that there should be an inquiry into line item allocations or the amounts thereof in a state budget or in a county budget and a judicial review of the merits or priorities thereof as might well be entailed by questions of inadequacy in specific areas and allocations to other purposes.
Furthermore, all the parties stipulated and agreed that there was no testimony required in this case, that all pertinent factual material was before the court and that the issues involved were solely of law. It was expressly requested that the court decide the summary judgment motions and make a determination on the complaint based solely on the papers submitted. The issue being essentially one of law, with no material facts in dispute, it may, therefore, be resolved without the necessity of a testimonial trial. R. 4:46-1; Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1955). There is nothing in the submitted papers even approaching a viable due process issue or asserting a violation of fundamental constitutional rights so as to provoke inquiry into legislative judgment. The allegation of due process violation, as sparse as it may be, is merely conclusory in nature and presents no such issue. Plaintiffs arguments have been fully presented and do not state a claim for relief, and particularly injunctive relief.
Clearly the State can not only mandate that the county appropriate sufficient amounts in the county budget to fully implement the challenged spending requirements in the statutory programs or mandates, at least up to the overall *369 5% limitation on increases in the county tax levy, but it can also require that as to programs established prior to the effective date of the Cap statute by state law that those items must be included first.
It is possible, although perhaps remote, that state-mandated expenses based on programs mandated prior to the effective date of the Cap statute could use up substantially all or even more than the 5% (exclusive of exceptions) that a county would otherwise be entitled to increase its final appropriations to provide other programs and services to county residents. Whether this would ultimately result in higher costs in the long run, as claimed by the various counties, because of increased costs arising from neglect of roads and highways and possible increased liability claims, as Hudson County projects, is a policy consideration for the Legislature and not the courts. All expenditures and programs not embraced by N.J.S.A. 40A:4-45.4 and still in effect and mandating appropriations and contributions by a county, even though enacted prior to the Cap statute, are thus includable within the 5% limitation. If experience with the statute indicates it should be amended in certain respects, this should be brought to the attention of the Legislature. See N.J.S.A. 40A:4-45.1.
The court concludes that the Cap statute was not intended to and does not affect budgetary requirements for maintenance of county patients in state hospitals or with respect to welfare programs, at least within the overall 5% limitation. A different conclusion would be contrary to the mandate of the statutes related thereto and the intent of the Annual Appropriation Act. An appropriation act, in addition to appropriating monies, also has some mandatory implications and reflects the current policy and enactment of the Legislature with respect to preexisting statutory formulas. The repeal by L. 1977, c. 10, of N.J.S.A. 40A:4-45.6, which by its language would have repealed all acts inconsistent with the Cap statute, fortifies this conclusion.

*370 IV
One point remains that requires some amplification. As observed, the exceptions from the restrictions of the Cap statute exclude from its limitations various categories, such as revenue generated by an increase in valuations within the county, capital expenditures funded by sources other than the county tax levy,[8] emergency resolutions "according to the definition provided in N.J.S.A. 40A:4-46", and debt service payments.
Subparagraph (e) of N.J.S.A. 40A:4-45.4 provides that "[e]xpenditures mandated after the effective date of this act pursuant to State or Federal law;" are "exceptions" to the 5% limit. (Emphasis added). Hence, a broad category of mandated expenditures are not or may not be subject to the Cap statute. The term "law" is concededly a broad term. In order to declare the law relative to the subsection (e) exception it is also necessary to interpret what that term means as employed.
The Attorney General urges that the word "law" therein means, and should be construed to mean, subject to "statutory law" enacted subsequent to the effective date of the Cap statute. A formal opinion of the Attorney General, F.O. Atty. Gen., No. 3, 1977, in referring to this subsection, stated in part: *371 Thus, in order to avoid undermining the expressed legislative purpose to limit local government spending, the language of these provisions must be interpreted strictly to exclude only those expenditures for mandatory programs enacted after the effective date of the Cap law. [Emphasis supplied.]
While recognizing "this strict construction may cause local governments serious difficulty in preparing their budgets and may force reductions in existing services to provide for inflationary costs of mandatory programs," the Attorney General concludes these problems must be resolved by further legislative action. A contrary interpretation, his formal opinion concluded, "would limit only the small proportion of expenditures arising out of local initiatives" and "nullify the significance of the words `after the effective date of this act.'" However, the conclusion is too broad and does not necessarily square with the language used by the Legislature, including the term "act" in the same exception, or the recognition in the policy statement of the Cap statute of the cross-purposes involved and that local governments "cannot be constrained to the point that it is impossible to provide necessary services to its residents."
It is an established principle in our law that even if all of the litigants agree on an interpretation of the law, that this is not binding on the courts whose principal responsibility it is to interpret the law. See, e.g., Schere v. Freehold Tp., 150 N.J. Super. 404, 408 (App. Div. 1977); and Fivehouse v. Passaic Valley Water Comm'n, 127 N.J. Super. 451, 457-458 (App. Div. 1974), certif. den., 65 N.J. 565 (1974). Although a formal statutory interpretation of the Attorney General, who as legal advisor to most state agencies has the duty of interpreting statutes pursuant to N.J.S.A. 52:17A-4(e), may be considered "strongly persuasive", see Evans-Aristocrat Industries, Inc. v. Newark, 140 N.J. Super. 226, 229-230 (App. Div. 1976), affd. 75 N.J. 84 (1977), it is clear that such interpretations and opinions are in no way binding on the courts. Crifasi v. Oakland, 151 N.J. Super. 98, 101 (Law Div. 1977), rev'd *372 in part on other grounds, 156 N.J. Super. 182 (App. Div. 1978).
It is commonly stated that the Legislature is presumed to know the common usage of phrases and, in the absence of intent to the contrary, to have employed them in their natural and ordinary meaning. Wager v. Burlington Elevators, Inc., 116 N.J. Super. 390, 396 (Law Div. 1971); La Polla v. Union Cty. Bd. of Chosen Freeholders, 71 N.J. Super. 264, 277 (Law Div. 1961); Lloyd v. Vermeulen, 40 N.J. Super. 151, 165 (Law Div.), aff'd, 40 N.J. Super. 301 (App. Div.), aff'd 22 N.J. 200 (1956).
In addition, words which have received judicial construction will generally be deemed to have been used by the Legislature in the sense that has been ascribed to them. Safeway Trails, Inc. v. Furman, 76 N.J. Super. 90, 101 (Law Div. 1962), rev'd 41 N.J. 467 (1964), app. dism. and cert. den., 379 U.S. 14, 85 S.Ct. 144, 13 L.Ed.2d 84 (1964). Compare that case with Quaremba v. Allan, 67 N.J. 1, 14 (1975); Brewer v. Porch, 53 N.J. 167, 174 (1969), and Petition of Keogh-Dwyer, 45 N.J. 117, 120 (1965).
In considering the use of the term "law" in N.J.S.A. 40A:4-45.4(e), the court examines the entire statute, and the language used, to attempt to ascertain the intent of the Legislature. See In re Sheffield Farms Co., 22 N.J. 548, 554 (1956); Palkoski v. Garcia, 19 N.J. 175, 181 (1955). It is clear that the word "law" is broad enough to, and has been interpreted to include "`statutory law or common law rule or doctrine.'" Seatrain Lines, Inc. v. Medina, 39 N.J. 222, 231 (1963). Administrative rules and regulations adopted pursuant to appropriate authorization also have the force and effect of law. See State v. Atlantic City Elec. Co., 23 N.J. 259, 270 (1957); Cammarata v. Essex Cty. Park Comm'n, 46 N.J. Super. 262, 269 (App. Div. 1957), aff'd 26 N.J. 404 (1958); Rutgers Council v. N.J. Bd. of Higher Ed., 126 N.J. Super. 53, 63 (App. Div. 1973).
*373 For example, in Winberry v. Salisbury, 5 N.J. 240 (1950), cert. den. 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950), the court noted, "No word in the law has more varied meanings than the term `law' itself." It concluded that the term "law" in the phrase "subject to law" in N.J. Const. (1947), Art. VI, § II, par. 3, cannot be limited to legislation alone. Rather, the term must refer to "substantive law" which encompasses much more than legislation by defining "the rights and duties which have come down to us through the common law." 5 N.J. at 247-248.
Absent a clear indication that the language in the statute is to be interpreted otherwise, it is to be read in accordance with its plain and ordinary meaning. Service Armament Co. v. Hyland, 70 N.J. 550, 556 (1976). There is no such clear indication here.
There can be no doubt that the Legislature is well aware of the distinction between the terms "statute" and "law." A comparison with other statutes illustrates that the Legislature has used the word "statute" as opposed to the broader term "law" when it specifically intended that limitation. Compare N.J.S.A. 40:41A-26 where the legislation stated "heretofore been mandated by State statute * * *." The legislation then goes on to speak of "general law" of this State, in N.J.S.A. 40:41A-28.
It should be further noted that, contrary to F.O. Atty. Gen. No. 3, 1977, the exclusion in N.J.S.A. 40A:4-45.4(e) does not use the word "enacted," which is a term generally referable to legislative action. See supra, pages 370-371. However, it does use the term "act," which is commonly referable to statutes, in the same sentence of the exception wherein the term "law" is used. This further emphasizes legislative awareness of the distinction between the terms used.
The court concludes, therefore, that the Legislature did not intend to restrict the word "law" to statutory law but that the term applies broadly to substantive law which *374 mandates expenditures after the effective date of the Cap statute. This term would include federal and state statutes and court decisions, and regulations having the effect of law.
Although this court concludes that the term "law" in subsection 4(e) of the Cap statute includes final judgments and determinations of substantive law of the court, other considerations involving the inherent powers of the court might also preclude a narrower interpretation. See Winberry v. Salisbury, supra; In re Salaries of Probation Officers, 58 N.J. 422, 427 (1971); In re Matter of Court Reorganization Plan of Hudson Cty., 161 N.J. Super. 483, 490 (App. Div. 1978), certif. granted, 77 N.J. ___ (1978).[9]

*375 V
In summary, the Cap statute does not, at least up to the percentage limitation of that statute, preclude state officers acting under law from requiring counties to include in their appropriations amounts for items such as maintenance of county patients in state hospitals, welfare programs or support of the judiciary. This is so even assuming the "state-mandated" expenses fall within the categories not excepted from the statute's limitations. There was no showing of irreparable harm and no injunction is warranted. There is no due process violation shown although plaintiffs may apply to the courts to establish a basis for consideration of such allegation. In any event, the exceptions as to items subsequently mandated by law is not restricted to statutes and broadens the statutory safety valves for county budgetary limitations. In the declaratory judgment aspect of this case the court determines the proper interpretation of the law to be as specifically held hereinabove.
Accordingly, the motion for summary judgment by defendants is granted and those of plaintiffs-intervenors are denied. The order to show cause of plaintiff and all complaints are dismissed. No costs.
NOTES
[1] Atlantic, Cape May, Middlesex, Gloucester and Warren Counties did not move to intervene and are not parties to this action.
[2] See comment to R. 2:2-3(a)(2) in Pressler, Current N.J. Court Rules.
[3] Somerset County at the oral argument with respect to the motions pointed out that its board of chosen freeholders control 67.9% of its 1978 budget while state-mandated expenses account for the remaining 32.1%. Morris County argues that its figures are more dramatic, with the state-mandated expenses approximating 70%. Union County complains that it was forced to utilize virtually all of its surplus to comply with the Cap statute, and this violates good business practices.
[4] A similar concept was contained in a proposed tax reform legislation package introduced in 1972, but which was not enacted. See A-1299 and A.C.R.-112 of 1972.
[5] The "State Expenditures Limitations Act," N.J.S.A. 52:9H-5 et seq., adopted August 18, 1976 and to expire June 30, 1980, provides a formula for determining maximum state appropriations. This formula appears to permit a 10-11% annual increase. It is obviously subject to legislative action at any time with respect to all its provisions or restrictions, and an amendatory bill extending its provisions for another three-year term has also received legislative attention. This statute does not affect the issues presented in this particular case.
[6] See, e.g. L. 1977, c. 137, and L. 1978, c. 60, which are the annual state appropriation acts for the fiscal years ending June 30, 1978 and June 30, 1979, respectively.
[7] Statutory enactments, including formulas set up under prior law relative to the maintenance of the mentally ill and welfare, do not just speak as of the date of enactment. They have continuing force and effect and reflect a continuing mandate. Thus, the repeal of the repealer in the Cap statute left all prior enactments intact. See at p. 369, infra.
[8] Interestingly, the corresponding exception relative to municipalities (N.J.S.A. 40A:4-45.3(b)) contains an exclusion relative to "programs funded wholly or in part by Federal or State funds in which the financial share of the municipality is not required to increase the final appropriations by more than 5%." Whatever the intent of that exception it is clear that the county has no analogous provision under N.J.S.A. 40A:4-45.4. The omission of such language appears intentional but the reason for it does not appear in the legislative history. On the other hand, the restriction on emergency appropriations by municipalities appears greater than for counties. Compare N.J.S.A. 40A:4-45.3(c) and N.J.S.A. 40A:4-45.4(c).
[9] The Appellate Division concluded in In re Matter of Reorganization Plan of Hudson County, 161 N.J. Super. 483 (App. Div. 1978):

* * * [A] court, and in this case the assignment judge in his administrative capacity, has the inherent power to provide the facilities, personnel and resources reasonably necessary for the performance of the judicial functions in the county. * * * [H]e must have the power to compel the appropriation and expenditure of funds by the coequal executive and legislative branches of government to accomplish such purpose, subject only to bounds of reasonable discretion.
[at 491]
Although the Appellate Division reasoned that this inherent power should only be invoked where adequate action is not forthcoming through conventional channels, that would not detract from the basic power possessed by the judiciary to require expenditure of county funds without statutory limitation.
Restricting the term "law" in the exclusion to only subsequent statutory mandates would possibly conflict with settled precedents in this State, for example: providing for defense of indigents in criminal cases, see State v. Rush, 46 N.J. 399 (1966), and State v. Williams, 46 N.J. 427 (1966); payment of judgments of the court in various actions (see, generally, N.J.S.A. 59:1-1 et seq. and N.J.S.A. 59:13-1 et seq.), as well as condemnation matters; school funding (cf. Robinson v. Cahill, 62 N.J. 473 (1973) cert. den. 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973); pretrial intervention programs (State v. Leonardis, 71 N.J. 85 (1976), on reh. 73 N.J. 360 (1977)), authority to assure provision of adequate staffing of the county prosecutor's office with respect to the criminal business of the courts (cf. In re Application of Bigley, 55 N.J. 53 (1969), and N.J.S.A. 2A:158-7). It seems unlikely that such matters would depend only on formal emergency appropriation procedures and the limitations thereof.